RECEIVED
CLERK'S OFFICE

2015 JAN -5 PM 12: 48

U.S. DISTRICT COURT
MIDDLE DIST. OF GEORGIA
MACON, GEORGIA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

UNITED STATES OF AMERICA,
and THE STATE OF GEORGIA,
*ex rel.* RANDKEDRA COLLIER-
ROBERTS,

        Relator,

v.

NEW BEGINNINGS CARE, LLC,
GOODWILL NURSING HOME, INC., and
MACON MANOR NRC, LLC,

        Defendants.

Case No.:

**5 : 15-CV-004**

**ORIGINAL COMPLAINT FOR:**
**Violations of False Claims Act, 31**
**U.S.C. §§ 3729 *et seq.***

**FILED UNDER SEAL PURSUANT TO 31**
**U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## ORIGINAL COMPLAINT

Relator, Randkedra Collier-Roberts, through her attorneys and on behalf of the United States of America, and the State of Georgia, hereby files this Original Complaint against Defendants New Beginnings Care, LLC, Goodwill Nursing Home, Inc., and Macon Manor NRC, LLC (collectively referred to herein as "Defendants"), and alleges as follows:

### I. NATURE OF THE CASE

1.    Relator Randkedra Collier-Roberts brings this *qui tam* action pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*, and the Georgia State False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 through 49-4-168.6 (collectively referred to herein as the "FCAs"); arising from Defendants' fraudulent schemes in connection with false claims submitted to the Government for health care services

1



provided to residents of nursing homes managed by Defendants.

2.      The United States is a Plaintiff bringing this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), which administer the federal Medicare and Medicaid Programs, the Department of Defense, which administers the TRICARE program, and the Department of Veterans Affairs, which administers the CHAMPVA program.

3.      The State of Georgia is a Plaintiff for which recovery is sought for damages to its state Medicaid program.

4.      The United States and Georgia are collectively referred to as the "Government."

5.      Relator, Randkedra Collier-Roberts ("Relator" or "Collier"), complains of (1) Defendants' false certifications in its billing records and certifications to the Government pertaining to medications provided to its nursing home residents for which Defendants billed the United States; and (2) false certifications in billing records and certifications to the Government pertaining to rehab services which were also billed to the United States.

6.      This misconduct resulted in unjust and illegal enrichment at the expense of the United States.  Through this action, Relator seeks to recover damages and civil penalties arising from Defendants' false and improper claims that were submitted to the United States and Georgia for payment under their healthcare programs.

## II.  THE PARTIES

7.      Relator, Randkedra Collier-Roberts, is a resident of Macon, Bibb County,

2

Georgia who was employed by Defendants as an LPN Charge Nurse from late June 2014 through October 30, 2014.

8. Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1) and Ga. Code Ann. § 49-4-168.2(b). Relator brings this action on behalf of the United States for violations of the Federal False Claims Act and on behalf of Georgia for violations of the Georgia State False Medicaid Claims Act.

9. Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein.

10. Defendant New Beginnings Care, LLC is a Tennessee corporation, with its principal office located at 4704 Hixson Pike, Hixson, Tennessee 37343. Its agent for service in Georgia is InCorp Services, Inc., 2000 Riveredge Pkwy. NW, Atlanta, Georgia 30328.

11. Defendant Goodwill Nursing Home, Inc. is a Georgia corporation with its principal place of business located at 4373 Houston Ave., Macon, Georgia 31206. Its registered agent for service is George B. Lockhart, 135 Giles Road, Warner Robins, Georgia 31903. George Lockhart is also the CEO and CFO of Goodwill Nursing Home, Inc.

12. Defendant Macon Manor NRC, LLC is a Delaware limited liability corporation, with its principal office located at c/o Jules Epstein, 600 Old Country Rd, Garden City, New York 11530. It is registered to do business with the Georgia Secretary of State.

13. The Defendants jointly own and operate the Goodwill Health and Rehab

3

nursing home located at 4373 Houston Ave., Macon, Georgia 31206 (the "Goodwill Nursing Home"). The nursing home is also known as Macon Manor and Houston Heights.

### III. JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3729-33.

15.    In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state law claims pleaded or which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. § 1367(a).

16.    Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the Government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relator made this pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2). Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing her False Claims Act complaint.

17.    This Court has personal jurisdiction over Defendants because they are headquartered and/or do business within this District. The wrongful acts described

herein occurred at the Goodwill Health and Rehab nursing home located at 4373 Houston Ave., Macon, Georgia 31206.

18.    Venue is proper within this District because Defendants conduct business in this District and many of the acts and practices complained of occurred in this District. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper in this District.

19.    Relator is familiar with Defendants' fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

## IV. FACTUAL BACKGROUND

### A.    Governmental Entities With Financial Interest in this Litigation

20.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., established the Health Insurance for the Aged and Disabled Program, popularly known as Medicare, a federally funded health insurance program administered by the Secretary of the Department of Health and Human Services ("HHS"), an agency of the United States, through the Centers for Medicare & Medicaid Services ("CMS").

21.    The Medicare program reimburses health care providers for specified health care services furnished to certain targeted populations, including persons who are over age 65 and persons who are disabled.

22.    The Secretary of HHS has broad statutory authority to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] insurance programs ..." 42 U.S.C. § 1395hh(a)(1).

23. In addition to promulgating regulations, the Secretary has the power to formulate rules for the administration of the Medicare programs, through the issuance of manual instructions, interpretive rules, statements of policy, and guidelines of general applicability. 42 U.S.C. § 1395hh(c)(1).

24. In order to be reimbursed by Medicare, providers rendering a medical service to Medicare beneficiaries must enter into a "provider agreement" with Medicare and receive a "provider number." 42 U.S.C. §§ 1395n(a) and 1395cc(a). These entities and individuals are referred to as "Medicare providers" or "providers."

25. To receive reimbursement from Medicare, the provider must submit a claim for reimbursement which includes the identity of the patient, the provider number, the service provided, and the medical necessity for the service rendered. The provider must certify that the information is accurate and complete.

26. Prior to January 1, 1999, facilities such as the nursing homes managed by Defendants were paid by Medicare on a cost reimbursement basis. This reimbursement method was phased out nationally between July of 1998 and January of 1999. After January 1, 1999, Defendants were paid under the prospective payment system ("PPS").

27. Under PPS, nursing homes such as the Goodwill Nursing Home were required to assess and classify residents into one of sixty-six (66) Resource Utilization Groups ("RUG") for Medicare and one of thirty-four (34) RUGs for Medicaid, based on the patients' conditions and care needs.

28. CMS used the RUG classification in determining the per diem reimbursement for patients. "Per diem" is the set daily rate that CMS pays a nursing

6

facility for providing care to a resident.

29.     The Minimum Data Set ("MDS") form is required to be completed and submitted to the Government for all nursing home residents, by nursing homes such as the Goodwill Nursing Home that receive reimbursement from Medicare or Medicaid. 42 C.F.R. § 483.315.

30.     In the MDS, Defendants must provide the Government with an accurate and comprehensive assessment of each resident's functional capabilities, identify health problems, and formulate a resident's individual plan of care. MDS assessments are required to be completed by nursing homes for all residents upon admission and then quarterly thereafter.

31.     MDS assessments are transmitted electronically by nursing homes to the MDS database in their respective states, which information is then captured into the national MDS database at CMS.

32.     MDS assessments are signed by the individuals who completed all or a portion of the form, and contain the following certification:

"I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to of may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility or on its behalf."

7

33. At all times relevant to this action, Defendants prepared and submitted MDS assessments of the residents in their care, which falsified the residents' true medical condition, falsified the medication and treatments provided to the residents, and falsified the residents' need for treatment and prospects for improvement. But for the submission of false MDS assessments, the Government would not have reimbursed Defendants in the amounts reimbursed.

34. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., established the Grants to States for Medical Assistance Programs, popularly known as Medicaid.

35. Medicaid is a federal and state-funded health insurance program administered by the various states.

36. The State of Georgia administers its Medicaid program through the Georgia Department of Community Health's Medical Assistance Plans Division.

37. Medicaid provides health insurance for the aged, blind, disabled or indigent in Georgia.

38. In order to be reimbursed by Medicaid, a person or entity rendering medical services to Medicaid beneficiaries must enter into a "provider agreement" with the state of Georgia and provide certifications similar to the Medicare certification described above.

39. During the relevant time period, Medicaid reimbursed nursing home facilities on a "per diem" basis, which rate was lower than the Medicare per diem rate.

40. The federal government and the states share the cost of servicing

Medicaid beneficiaries. The specific percentage that the federal government reimburses a state is referred to as the federal medical assistance percentage ("FMAP") and is calculated for each state according to a formula which is based on per capita income. The FMAP is designed so that the federal government pays a larger portion of Medicaid costs in state with lower per capita income relative to the national average (and vice versa for states with higher per capita incomes). FMAPs are recalculated and published annually between October 1 and November 30 in the Federal Register. The FMAP for Georgia for fiscal years 2013 and 2014 was about 66% (sixty-six federal dollars for each thirty-four state dollars spent). To qualify for these federal matching funds, each state must submit a plan to the Secretary of the Department of Health and Human Services for approval.

41.   The State of Georgia has submitted a plan and, at all relevant times, has received federal funds in accordance with the established FMAPs outlined above.

42.   Submission of claims to and payment by Medicaid to providers such as Defendants implicate the federal FCA insofar as the state payments are matched and/or reimbursed by the federal government. *See, e.g.*, 42. C.F.R. §§ 430.0-430.30.

43.   TRICARE, formerly the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), is funded by the United States, administered by the Defense Health Agency, and provides medical benefits to retired members of the military services as well as spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty days or longer. TRICARE is administered by the United States Department of Defense.

44. CHAMPVA (the Civilian Health and Medical Program of Veterans Affairs) is a program, funded by the United States, which provides medical benefits to spouses and children of disabled veterans.

45. Medicare, Medicaid, TRICARE, and CHAMPVA are collectively referred to herein as the Government.

B. **Statutory and Regulatory Requirements that Provide Bases for Relator's Claims**

46. The federal False Claims Act provides, *inter alia*, that any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729(a)(1)(A-G).

47. The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)    provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (b)(2).

48.    Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval (or to a contractor if the money is to be spent on the Government's behalf or to advance a Government program and the Government provides any portion of the money requested or demanded) is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the actual damages that the Government sustained. 31 U.S.C. § 3729(a). The Act also permits assessment of the civil penalty even without proof of specific damages.

49.    Pursuant to the express language of the federal FCA and the statutory definition of "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the federal government, and thus may give rise to liability under the federal FCA, as well as the state FCA.

50.    The Nursing Home Reform Act, 42 U.S.C. §§ 1396r, et seq., (the "NHRA"), defines nursing facility as "an institution ... which -

(1) is primarily engaged in providing to residents -

(A) skilled nursing care and related services for residents who require medical or

11

nursing care;

(B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons;

(C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental illness ..." 42 U.S.C. § 1396r(a).

51.    The Medicare, Medicaid, TRICARE, and CHAMPVA programs pay for nursing home care for their beneficiaries. Facilities that wish to be reimbursed by the Government for providing services to these beneficiaries must meet all applicable federal and state standards and requirements.

52.    The NHRA provides that: "A nursing facility must operate and provide services in compliance with all applicable Federal, State and local laws and regulations ... and with accepted professional standard and principles which may apply to professionals providing services in such a facility." 42 U.S.C. § 1396r(d)(4)(A).

53.    The NHRA and applicable regulations further provide that nursing homes "must provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a plan of care which ... describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met ..." 42 U.S.C. § 1396r(b)(2)(A); see also 42 C.F.R. § 483.25.

54. Nursing homes must also ensure that residents receive proper treatment and care for any special needs (including injections) they may have and that residents are free of any significant medication errors. 42 C.F.R. § 483.25(k) and (m).

55. Nursing homes that participate in the Government programs must meet specific requirements in order to qualify for participation and receive taxpayer dollars from the program. These requirements are set forth in 42 C.F.R. § 483.1, et seq., and "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid." 42 C.F.R. § 483.1. As outlined in detail above and in the allegations that follow, Defendants failed to provide care and services that met Medicare's requirements with regard to standard of care. Plaintiffs contend that each and every of Defendants' violations of the Nursing Home Reform Act and regulations constituted a violation of the conditions of participation for the Medicare and Medicaid programs within the meaning of 42 C.F.R. § 483.1, et seq. The submission of each claim for payment by Defendants for any of the services purportedly rendered to the residents of Defendants' nursing homes during the time period covered in this Complaint were therefore false, fraudulent, and a violation of the federal False Claims Act.

56. At the state level, the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 through 49-4-168.6, provides similar protections to the federal statute, including liability for presenting false or fraudulent claims to the Georgia Medicaid program, using false statements or records material to a false or fraudulent claim, or conspiring to do so (*Id.* § 49-4-168.1(a)); and a private person's right to bring an action

for a false Medicaid claim. (*Id.* § 49-4-168.2(b)).

57.    The NHRA mandates that the states shall be responsible for certifying that nursing facilities are in compliance with federal statutes and regulations. 42 U.S.C. § 1396r(g)(1)(A).

58.    In order to become a Medicare provider, Defendants were required to and did sign the Health Insurance Benefit Agreement (Form CMS 1561) and therein "agree[d] to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 C.F.R."

59.    Defendants also signed the Medicare Healthcare Provider/Supplier Enrollment Application (Form CMS-855), wherein they certified to abide by the Medicare or other applicable federal heath care program laws, regulations and instructions and that payment of a claim by Medicare or other federal health care program is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark law), and on a provider/supplier being in compliance with any applicable conditions of participation in any federal health care program.

60.    They also agreed not to knowingly present or cause to be presented a false or fraudulent claim for payment by the Medicare or other federal health care programs, and not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

61.    Defendants also completed and submitted an Electronic Data Interchange ("EDI") Enrollment Form in order to bill Medicare electronically. In the EDI Enrollment

Form, Defendants agreed to be "responsible for all Medicare claims submitted to HCFA by itself, its employees, or its agents" and that they "will submit claims that are accurate, complete, and truthful." Defendants further acknowledged that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required pursuant to this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

62.     Defendants also entered into Medicaid Provider Agreements with the State of Georgia.

63.     The Medicaid Provider Agreement states that as a prerequisite to enrolling in and receiving payment from the Medicaid program, the provider must maintain full compliance with all certification requirements established by the Georgia authorities overseeing the Georgia Medicaid program. The agreement also states that the provider must maintain full compliance with the requirements of the Title XIX of the Social Security Act and the regulations promulgated thereunder relating to skilled care facilities.

64.     Defendants are liable because they falsely certified: (1) that they would not make any false claims for payment by Medicare; and (2) that their cost reports were true and accurate.

65.     Medicare/Medicaid providers utilize various forms for requesting payment from the government including, without limitation, cost reports. Participating health care

providers must file cost reports annually. 42 U.S.C. § 1395g; and 42 C.F.R. § 413.20(b). With each submission of a cost report, the provider certifies that the contents of said cost report are "true, accurate, and complete statements in accordance with applicable instructions."

66.     Cost report certifications are a condition of payment under Medicare. *See*, *United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d. 1017, 1046 (S.D. Tex. 1998). Thus, because Medicare/Medicaid payments are conditioned upon a cost report certification, a fraudulent certification of the cost report's express certification language supports an action under the FCAs. Additionally, the Health Care Finance Administration ("HCFA" now "CMS") "interprets the phrase 'applicable instructions,' to encompass Medicare program requirements." *Id.* at 1041-1042. "Applicable instructions" are found in the Provider Reimbursement Manual, Intermediary Letters, and C.F.R. provisions. Where a provider does not comply with the Medicare program guidelines, but nonetheless executes cost report certifications, it violates the FCAs. Furthermore, when a provider executes the explicit cost report certifications, it also implicitly certifies it will continue to comply with the applicable regulations or file an amended cost report reflecting its non-compliance.

67.     Defendants executed a Health Insurance Benefit Agreement (Form CMS-1561) which states that in order to receive payment under title XVIII of the Social Security Act, the provider of services agrees to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 C.F.R." Additionally, Defendants signed the Medicare Healthcare Provider/Supplier Enrollment Application

16

(Form CMS-855A) wherein they certified to abide by the applicable Medicare laws, regulations, and program instructions and confirmed understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare. They also agreed to not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and to not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

68.     Defendants submitted falsely certified cost reports to the Government for payment for services allegedly rendered which were not rendered.

69.     By falsely certifying compliance, and submitting the falsely certified cost reports to the Government, Defendants violated the federal FCA. The condition of payment was not met. Nevertheless, Defendants' false billing resulted in their being reimbursed by Medicare and Medicaid.

70.     By submitting false claims and being paid by the United States and the State of Georgia, Defendants are liable under the FCAs. But for Defendants' submission of falsely certified cost reports, the Government would not have paid Defendants.

71.     On information and belief, Relator alleges that the fraud outlined herein began before she began working there, and continues to this day.

72.     For the reasons stated below, Defendants have, in reckless disregard or in deliberate ignorance of the truth or the falsity of the information involved, made or used

false or fraudulent records and statements in order to get false or fraudulent claims paid or approved. Such conduct violates the FCAs. 31 U.S.C. § 3729(a)(1)( B); Ga. Code Ann. 49-4-168.1(a)(2).

## C.  Background of Defendants and Relator

73.  New Beginnings Care, LLC manages multiple skilled nursing home facilities, including facilities in Georgia, Tennessee, Mississippi, and Arkansas.

74.  Although the facilities may be separately owned and operated, New Beginnings Care, LLC manages and operates them as a unified network.

75.  Accordingly, upon information and belief, the acts complained of herein were practiced uniformly at each facility managed by New Beginnings Care, LLC.

76.  Many of Defendants' patients are covered by Medicare, Medicaid, TRICARE, and/or CHAMPVA and accordingly Defendants bill the Government for procedures and other medical services provided to these patients.

77.  Relator was hired as an LPN Charge Nurse at the Goodwill Nursing Home in late June 2014 and was employed there until she resigned on October 30, 2014.

78.  Before Relator went to work at the Goodwill Nursing Home, she was a traveling nurse for 7-8 years who worked at about 60 nursing homes throughout Georgia as an independent contractor. The abuse and Government fraud she witnessed at the Goodwill Nursing Home far exceeded anything she has witnessed at any of the other nursing homes.

79.  Relator also witnessed fraud committed on the Government when working at a second nursing home managed by New Beginnings Care, LLC, the Jeffersonville

Health & Rehab nursing home located at 113 Spring Valley Dr., Jeffersonville, Georgia 31044, where she worked for 3 or 4 months during 2010.

80.     Relator also has a best friend who works as an LVN at a third nursing home managed by New Beginnings Care, LLC, the Abbeville Healthcare & Rehab, 206 Main Street East, Abbeville, Georgia 31001. Relator's friend told her that she witnessed the same fraudulent practices at the Abbeville facility that Relator witnessed at the Goodwill facility in Macon and the facility in Jeffersonville.

81.     Relator's experience at the nursing homes in Macon and in Jeffersonville, and her friend's experience at the Abbeville facility, give her reason to believe the pervasive fraud she witnessed was not isolated abuses, but were representative of the types of fraud practiced at all nursing homes managed by New Beginnings Care, LLC.

D.     **False Claims for Therapy Not Necessary and for Therapy Not Provided**

82.     In an effort to increase its profits, Defendants engage in systematic overbilling of the Government for rehabilitation therapy services.

83.     Upon information and belief, New Beginnings Care, LLC overbills the Government for therapy provided to the residents of all of the facilities it manages.

84.     In order to maximize Defendants' profit at the expense of the Government, Defendants fabricated therapy plans for their residents, overstating the types (physical, occupational, and speech) and amounts of therapy that were necessary and stating recovery goals which they knew were unrealistic, if not impossible, in order to justify more therapy than was actually reasonable and necessary.

85.     Ann Beasley at the Goodwill Nursing Home regularly approved therapy

19

plans for residents who were clearly not able to do the therapy in order to maximize profit for the facility without regarding to what therapy was actually reasonable or necessary.

86.    Relator observed several examples of patients who received unreasonable and unnecessary services, as a result of Defendants formulating therapy plans for patients that deliberately ignored the patients' prospects for improving health or functions, in order to increase Defendants' profits.

87.    For example, Relator observed Patient A[1], a wheelchair-bound, elderly man who was completely unable to move with no chances of recovering mobility, and in fact was actually on hospice, with no chance of recovery. Despite this fact, Patient A was given an intensive therapy plan and was regularly sent to physical therapy. Although he sat completely immobile at physical therapy and did not participate in any way, the therapists made false representations on his chart indicating that he participated in therapy and was making progress, neither of which was true.

88.    As another example, Relator observed Patient B, an HIV-positive, mentally unstable person. Patient B's severe mental problems made him completely unable to participate in physical therapy. Despite this fact, Patient B was given an intensive therapy plan and was regularly sent to physical therapy. Although he did not participate in any way, the therapists made false representations on his chart indicating that he participated in therapy and was making progress, neither of which was true.

---

[1] The name of Patient A and other anonymous patients are named in the Disclosures but omitted from this Complaint in order to protect their privacy.

89. As another example, Relator observed Patient C, who was repeatedly sent to therapy sessions in which he refused to participate. Despite knowing that Patient C would not participate in, and could not benefit from therapy, he was regularly sent to therapy and the Government was billed for his therapy sessions.

90. As another example, Patient D, was punished by being left in her own urine and feces as punishment for screaming. She was mistreated and given unnecessary therapy.

91. As another example, in August or September 2014, Patient E was ignored and given no care for her illness during an entire weekend. By the time she was seen on the Monday morning following the weekend she was beyond recovery and died two days later.

92. Relator observed multiple patients in the same or similar circumstances as those described above.

93. Relator's friend at the Abbeville facility worked exclusively with mentally unstable residents whose mental problems made them incapable of participating in physical therapy. Nevertheless, the Government was billed for physical therapy that was not necessary or reasonable, and often not provided.

94. Defendants regularly increased therapy for patients without clinical justification or need, and increased the amount of therapy they provided (or claimed to be providing) to patients during the Medicare assessment periods in order to improperly increase their Medicare payments by moving patients into higher RUG level therapy groups.

95. Defendants used unnecessary modalities, such as heat, cold, and electrical treatments, to increase the patient's number of therapy minutes.

96. Defendants billed the Government for patients who were no longer in need of skilled nursing facility treatment, and accordingly should have been discharged, but instead were kept at the nursing facility until their 100-day Medicare benefits were exhausted.

97. Defendants improperly placed patients in group therapy that was unrelated to their plans of care.

98. Defendants billed the Government for services that fell into the category of personal care services and did not require skilled nursing services or professional rehabilitation therapy services.

99. Defendants knew that they were billing for medically unreasonable, unnecessary, and unskilled services.

100. Defendants had knowledge that they were billing for unnecessary services based on the numerous complaints from its employees about being pressured to commit the acts described above.

101. Defendants ignored and/or minimized complaints and retaliated against employees who complained.

102. Defendants had their CNA's (certified nursing assistants) fill out daily charts with false information, which false information was used to generate false MDS reports. These false MDS reports overstated the level of therapy being provided to the residents of Defendants' nursing homes (in order to move them to a higher RUG level).

103. The falsification of daily charts by CNA's also served to misrepresent the residents' Activities of Daily Living (ADL) scores, in order to falsely represent the level of care the residents, to make it appear that they needed extensive services, which resulted in increased payments from the Government. The CNA's were given a list of tasks to perform for each resident. Rather than initial only the tasks they actually performed, they routinely initialed all the tasks to falsely represent that residents were getting more services than they actually were getting.

104. Charge nurses, like Relator, were charged with supervising between 3 and 5 CNA's and were charged with ensuring that the CNA's were performing the tasks they were charged with. Relator learned through her experience that the CNA's were regularly and systematically misrepresenting the care provided to the residents and their conditions. For example, misrepresentations were regularly provided about meals fed to residents, showers, and diaper changes. Relator knew that false representations were being made about meals being fed to residents because she saw the full meal trays being returned to the kitchen, witnessed CNA's eating residents' meals, and saw the records of weight loss for residents who were not being fed.

105. While at the Jeffersonville facility, Relator heard the Jeffersonville facility MDS coordinator complain that "she did not look good in orange [prison clothing] and that if she did what [the Jefferson facility] Administrator Francis Phelps was asking her to do, she would get 10 years in prison." Ms. Phelps was later fired for various reasons, including bragging that she was increasing profits by spending no more than $3 per day to feed each resident.

D. **Defendants' False Claims for Drugs Not Provided**

106. Defendants also falsified claims regarding the medications being provided to their nursing homes' residents in order to overbill the Government.

107. LPN's would routinely mark a chart as if a certain drug was given to a resident when it was not.

108. Nurses use an MAR (Medication Administration Record) to document medicines provided to residents.

109. If a prescription medicine on an MAR form is not available, a nurse is supposed to contact a pharmacy and have the medicine couriered to the nursing home. If an over-the-counter medicine is not available, an administrator is to order it. Because this is relatively expensive, nurses were instructed not to do it and instead to wait until Ms. Beasley ordered the medicine, and to let the residents go without medicine in the interim.

110. All nurses were instructed by the unit managers and Directors of Nursing to sign MAR forms indicating that medicines were given even when the medicines were not available and were not given. They were told to make these false representations because without them, the nursing home's payments from the Government would be lessened. They were instructed on the importance of marking MAR forms to indicate that medicines were provided (even when they were not) in order to obtain payment from the Government.

111. At times the Goodwill Nursing Home had no insulin syringes at all despite having multiple diabetic residents. At those times, the diabetic residents simply went

24

without insulin while their forms indicated they were being given insulin.

112.   Tanya Pugh, a Unit Manager at the Goodwill Nursing Home, rationed out gloves and diapers because there were not enough to go around and the Administrator did not want to purchase more.  She knew that the nurses had insufficient gloves and diapers to properly care for the residents in a safe hygienic manner.

113.   Teresa Gocial was recently fired from the Goodwill Nursing Home after reporting (truthfully) that she was being instructed to falsely represent giving medicines that she did not give.

114.   The Goodwill Nursing Home also had problems with nurses stealing drugs, which was another cause for drug shortages.

115.   Medicines unavailable for months at a time were misrepresented as being administered to residents.

E.     **Personnel With Knowledge of Fraud**

116.   The Goodwill Nursing Home had two MDS Coordinators, Gwen Holsey and Tammy [last name unknown.]

117.   Although MDS Coordinators are legally required to be registered nurses (RN's), both Gwen Holsey and Tammy were LPN's.  They routinely had RN's sign off on their MDS forms without any knowledge to verify the information on the forms.

118.   There were only two RN's in the Goodwill Nursing Home, Carolina Brown, the Director of Nursing, and Amy Chandler, who worked from 3:00 pm until 11:00 pm at the Goodwill Nursing Home.

119.   The Unit Manager was Alyssa Andrews, an LPN.  Alyssa Andrews's

nursing license had several restrictions as a result of her past history of narcotics and pain pill abuse. These restrictions precluded her from administering or having access to narcotics and pain medicine. However, she regularly ignored these restrictions and hid her violations by having Amy Chandler falsely certify that she (Amy Chandler), rather than Alyssa Andrews, was providing the medication. This fraud was known by everybody at the Goodwill Nursing Home.

120. Ann Beasley was the Administrator of the Goodwill Nursing Home and had first-hand knowledge of all fraud alleged in this Complaint.

121. Upon information and belief, Ann Beasley committed this fraud with the knowledge and active participation of her supervisors at New Beginnings Care, LLC, who implemented these practices at the other nursing homes it managed in the same manner as a the Goodwill Nursing Home.

122. The Goodwill Nursing Home's corruption and fraud resulted in multiple complaints from residents' family members and a high number of visits from Georgia nursing home inspectors.

123. The Goodwill Nursing Home had a secret code it used to alert employees that inspectors were on the premises and to hide its multiple violations. When an inspector arrived at the Goodwill Nursing Home, a page would be broadcast over the speaker system, "Paging Dr. Brown." There was no Dr. Brown at the Goodwill Nursing Home and all employees were instructed that this was a coded message instructing all employees to hide violations because an inspector was on the premises.

124. Defendants' facilities receive state and federal funds and as part of their

participation in the Medicare, Medicaid and other Government programs.

125. Nursing home residents' rights are guaranteed by the federal 1987 Nursing Home Reform Law. The law requires nursing homes to meet federal residents' rights requirements in order to participate in Medicare, Medicaid and other Government programs.

126. Defendants fail to comply with these requirements and make false claims regarding its compliance with these requirements in order to receive funds from Medicare, Medicaid and other Government programs.

## V. CAUSES OF ACTION

### A. Count One: Federal False Claims Act

127. All allegations in this Complaint are incorporated herein by reference.

128. Relator brings this Qui Tam action on behalf the United States Government to recover treble damages and civil penalties under 31 U.S.C. § 3729(a), which imposes liability on a person who- (a) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used, a false record statement to get a false or fraudulent claim paid or approved by the Government; and, (c) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

129. By virtue of the acts described herein, Defendants violated 31 U.S.C. §§ 3729(a)(1)(A), (B), and (C), and knowingly presented or caused to be presented thousands of false or fraudulent claims to the U.S. and Georgia governments for

## JURY TRIAL DEMAND

Relator hereby demands a jury trial.


Respectfully submitted,


By: _____
Cory S. Fein (*pro hac vice* to be filed)
Cory S. Fein, PC
712 Main St., Suite 800
Houston, TX 77002
cory@coryfeinlaw.com
(281) 254-7717 (phone)
(530) 748-0601 (fax)

Jason Marcus
Georgia Bar No. 949698
Julie Bracker
Georgia Bar No. 073803
Bracker & Marcus LLC
1715 Liberty Ln
Roswell, GA 30075
Ph: 678-644-6392
Jason@fcacounsel.com

**ATTORNEYS FOR RELATOR**